## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**JASON THOMAS, et al.,**

        **Plaintiffs,**                            **Case No. 1:24-cv-422**

        **v.**                                    **JUDGE DOUGLAS R. COLE**

**MITSUBISHI ELECTRIC**
**AUTOMOTIVE AMERICA, INC.,**

        **Defendant.**

### OPINION AND ORDER

This putative class action lawsuit stems from a wage-and-hour dispute between Mitsubishi Electric Automotive America, Inc., and its hourly employees. Plaintiff, on behalf of himself and all others similarly situated, now seeks to settle his claims with Mitsubishi. Plaintiff moves, without opposition, for preliminary certification of the putative class for settlement purposes and for preliminary approval of the settlement. (Doc. 27). At the same time, Plaintiff moves for leave to file an Amended Complaint (Doc. 26). For the reasons discussed below, the Court **GRANTS** Plaintiff's Motion for Leave to File First Amended Complaint (Doc. 26),[1] **GRANTS** Plaintiff's Unopposed Motion for Preliminary Approval of Class Action Settlement (Doc. 27), and as a result, **PRELIMINARILY CERTIFIES** the class, and **PRELIMINARILY APPROVES** the proposed class action settlement.

---

[1] The Court notes that an Amended Complaint (Doc. 25) was filed on Tuesday, April 22, 2025, but the Motion for Leave to File First Amended Complaint (Doc. 26) was filed on Friday, April 25, 2025. Because the Plaintiff needed the Court's consent to file an amended complaint at this juncture, Fed. R. Civ. P. 15(a), the Court will cite to the Amended Complaint attached as Exhibit A to the Motion for Leave to File (Doc. 26-1).

## BACKGROUND[2]

Mitsubishi is a large manufacturer and seller of electrical and electronic products and systems for automobiles. (Doc. 26-1, #191). It operates many facilities, employing over 1,000 individuals, but two major plants are relevant here: one in Mason, Ohio, and the other in Maysville, Kentucky. (*Id.* at #189, 191). The Mason, Ohio, facility also serves as Mitsubishi's U.S. headquarters. (*Id.* at #189).

As a large employer, Mitsubishi utilizes an electronic timekeeping system to track employees' work hours and overtime. (*Id.* at #191). The timekeeping policies related to that system form the basis of this lawsuit. Plaintiffs claim that, until March 2024, Mitsubishi had a rounding policy that effectively undercompensated employees. (*Id.* at #191–93; Doc. 27, #209 n.1). Mitsubishi no longer employs that rounding policy. (Doc. 27, #209 n.1). But while it was in place, if employees clocked in before the start of their shift, the system rounded the time to their shift start, thereby not counting the minutes they arrived early. (Doc. 26-1, #192). Similarly, the system would not count if the employee clocked out after their shift ended. (*Id.*). For example, Thomas alleges that one day he arrived at 15:23, but the system marked it as 15:30, the official start of his shift. (Doc. 27, #208). On a different occasion, he clocked out at 2:04, but the system rounded it down to 2:00. (*Id.* at #209). He claims that he, and the other employees, were not compensated for these extra minutes, and this rounding "disproportionally benefit[ed]" Mitsubishi. (Doc. 26-1, #192).

---

[2] Because the Court later grants the Motion for Leave to File First Amended Complaint (Doc. 26), *see infra* Part A, the Court cites the Amended Complaint (Doc. 26-1) in relaying the relevant background. But it notes that Mitsubishi, in the proposed class action settlement, denies any wrongdoing. (Doc. 27-1, #265).

Fed up with the rounding policy, Jason Thomas filed this lawsuit on August 9, 2024. (Doc. 1). Thomas worked in the Mason, Ohio, facility from June 22, 2019, to February 7, 2025. (Doc. 26-1, #189). In the Amended Complaint (Doc. 26), which the Court grants leave to file below, *see infra* Part A, Thomas adds another named plaintiff, Joseph Horner. (Doc. 26-1, #189). Horner worked in the Maysville, Kentucky, facility from March 5, 2018, through December 15, 2022. (*Id.*). Plaintiffs bring this action as both a collective action under the FLSA and as a class action under Rule 23. (*Id.* at #193–97). In the Amended Complaint, Plaintiffs assert four claims: unpaid wages and unpaid overtime under the FLSA (Counts I and II), which are the collective action claims, and the same under Ohio and Kentucky state law (Counts III and IV, respectively), which are the class action claims.[3] (*Id.* at #197–202).

After mediation and subsequent negotiation, the parties now seek to bring this dispute to a close by settling all of the claims at issue, including the individual Plaintiffs' state and federal claims, the putative class members' state claims, and the collective members' FLSA claims (to the extent that other persons file consents to join this action). (Doc. 27). The proposed settlement agreement generally defines the class as "all Mason, Ohio Settlement Class Employees and Maysville, Kentucky Settlement Class Employees." (Doc. 27-1, #243). The former group includes "all non-exempt employees of [Mitsubishi] who worked at its facility in Mason, Ohio at any point from

---

[3] The Amended Complaint differs from the original Complaint by adding factual allegations regarding the Kentucky facility and the related Kentucky law claim; otherwise, the FLSA claims and Ohio law claim remain the same. (Doc. 1; Doc. 26-1, #184).

October 24, 2021, to May 11, 2024." (*Id.* at #239). And the latter group likewise comprises all non-exempt employees who worked at the Maysville, Kentucky, facility during that same time period. (*Id.*). The proposed agreement then goes on to release "any and all state and local claims arising from [Settlement Class member's] employment that have been asserted in the Action." (*Id.* at #246–47). For those Settlement Class Members who file claim forms (which include consents to join the FLSA collective action), they also release all related federal law claims. (*Id.* at #246–47). Mitsubishi, in turn, agrees to pay $515,000 into a non-reversionary common fund that will settle all of the released claims. (*Id.* at #239, 254).

Assuming the Court preliminarily approves the agreement, Mitsubishi will provide the contact information, payroll information, and any other data necessary to the settlement administrator. (*Id.* at #253). Within fourteen days after the administrator receives the necessary employee information from Mitsubishi, the administrator will mail the proposed settlement notice to all Settlement Class employees. (*Id.* at #254–55). Settlement Class employees generally will have sixty days to submit claim forms, opt-out statements, or objections.[4] (*Id.* at #240). Those who submit claim forms will be Participating Class Members. (*Id.*). And the claim form will include a consent to join the FLSA claims in the action. (*Id.* at #293–94).

The settlement agreement further contemplates that the settlement administrator will establish a qualified settlement fund (QSF) according to 26 C.F.R.

---

[4] In the event the administrator re-mails the claim form to specific individuals, the Participation Deadline will extend either thirty days from when the new mail was sent or seventy-five days from the original mailing date, whichever is earlier. (Doc. 27-1, #240).

§ 1.468B-1. (*Id.* at #254). Within 30 days, Mitsubishi will fund the QSF with $515,000. (*Id.*). From there, the settlement administrator will set aside $5,000 as a reserve fund to be used for paying amounts "to Participating Class Members who dispute their allocation amounts, to individuals who were not identified as Settlement Class Employees but have a good faith claim for participation in the settlement, or any other reasonable purpose." (*Id.*). Once the sixty-day deadline passes for Settlement Class members to file claims (with those who do so becoming Participating Class Members), the administrator will disburse the common fund in the manner set forth by the agreement and described below, and no funds will revert to Mitsubishi. (*Id.*).

The settlement administrator will disburse available amounts from the common fund on a pro rata basis according to Participating Class Members' eligible work weeks. (*Id.* at #244). More specifically, before the participation deadline, the administrator will determine each Settlement Class Employee's estimated allocation, or pro rata share, by "dividing th[at] Settlement Class Employee's Eligible Workweeks by the total combined Eligible Workweeks for all Settlement Class Employees." (*Id.*). Then, for employees who opt-out or do not timely submit a claim form, and thus do not become Participating Class Members, their preliminary allocation will be added back to the total fund. (*Id.*). Finally, once the participation deadline passes and the Court enters final approval, the administrator will determine each Participating Class Member's final proportionate share of the net settlement amount by "dividing the Participating Class Member's Eligible Workweeks by the total combined Eligible Workweeks of all Participating Class Members." (*Id.*). In

5

other words, each Participating Class Member will be assigned a percentage of the funds to be distributed, but Settlement Class Members who are not Participating Class Members (because they opted out or did not return a claim form) will not receive payment.

Payments to the Participating Class Members will eventually come from a portion of the $510,000 referenced above (i.e., the $515,000 payment, less the $5,000 set aside for the reserve fund). First, though, the administrator will use those funds to pay class counsel and the named plaintiffs. (*Id.* at #245). Starting with the latter, the parties agree that named plaintiff Jason Thomas shall receive a gross amount not to exceed $10,000 and named plaintiff Joseph Horner an award not to exceed $2,500, with the exact amounts, subject to those limits, up to the Court. (*Id.*). Attorneys' fees, for their part, will not exceed one-third of the common fund, determined to be $171,666.67, and costs and expenses will not exceed $15,000. (*Id.*). Again, though, the Court will determine the precise amounts of each. (*Id.*). The common fund will also be used to pay reasonable settlement administration costs. (*Id.* at #253). Finally, the net amount of the $510,000 remaining after the payment of the above-identified costs will be available for distribution to each Participating Class Member pursuant to the percentage calculated as described above. (*Id.* at #239, 244).

The settlement agreement also provides for the treatment of any unclaimed or unused amounts. Start with the former. As to any checks issued to Participating Class Members that go uncashed, the settlement administrator will retain the funds until all such unclaimed checks are void. (*Id.* at #260). Within thirty days of that, the

6

administrator will distribute to the State of Ohio Department of Commerce Unclaimed Funds program the aggregate amount of the unclaimed Participating Class Member check amounts that would have gone to Participating Class Members who are part of the Mason, Ohio, Settlement Class Employees. (*Id.*). Similarly, any unclaimed funds that were intended for Participating Class Members from the Maysville, Kentucky, Settlement Class Employees will go to the Commonwealth of Kentucky Treasurer's Unclaimed Property program. (*Id.*).

"Unused reserve funds" by contrast refers to any portion of the $5,000 set aside for the reserve fund that the administrator does not use. As to those amounts, the administrator will first attempt to distribute the funds to Participating Class Members on a pro rata basis. (*Id.*). If that proves economically infeasible, though, then the funds will be distributed on a cy pres basis to Legal Aid Society of Greater Cincinnati and Legal Aid of the Bluegrass, with 50% going to each (i.e., a maximum of $2,500 to each if the settlement administrator uses none of the reserve funds). (*Id.* at #260–61).

ILYM Group, Inc., a company experienced in class action claim administration, will process class claims and distribute payments to the class; process and disburse attorneys' fee awards and service awards; and provide notice to the class. (*Id.* at #253). To effectuate notice, ILYM Group will do a few things. As mentioned above, first, Mitsubishi will provide the contact information to ILYM Group. (*Id.*). Within fourteen days of receiving the contact information, ILYM Group will mail the Court-approved settlement notice and claim form to all settlement class employees. (*Id.* at

#254–55). For those employees with a known email address, the administrator will also email a link to the case website. (*Id.*). The case website will contain the settlement notice and allow settlement class employees to submit their claim form electronically. (*Id.*). Additionally, the administrator will create a toll-free telephone number, email address, and mailing address to enhance communication with settlement class employees. (*Id.* at #264). Lastly, the administrator will provide periodic updates to counsel, including forwarding contact information for settlement class employees with questions for class counsel. (*Id.*).

The Court has reviewed the proposed settlement agreement, (Doc. 27-1), and Plaintiffs' Unopposed Motion for Preliminary Approval (Doc. 27). The Court also has reviewed the Amended Complaint (Doc. 26-1). The matters are ripe for review.

## LEGAL STANDARD

Generally, a party may amend its pleading once as a matter of course. But in all other cases, it may amend only with the opposing party's consent or with leave of the Court. Fed. R. Civ. P. 15(a). Federal Rule of Civil Procedure 15(a)(2) provides that the Court "should freely give leave when justice so requires."

Turning to the class issues, Federal Rule of Civil Procedure 23(e)(1)(B) directs a court to determine, at the preliminary-approval stage, whether it will likely be able to (1) approve the proposed settlement agreement under Rule 23(e)(2) and (2) finally certify the class for purposes of judgment. Rule 23(e)(2), in turn, governs when a court may, assuming it has already certified a class, approve a class action settlement. That provision requires the Court to determine whether the proposed settlement is "fair,

reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). Putting those together, at the preliminary-approval stage the Court's job is to determine whether the proposed class likely meets Rule 23's requirements and the proposed settlement is likely to be a "fair, reasonable, and adequate" disposition of the class claims, all subject to later confirmation at the final approval hearing.

## LAW AND ANALYSIS

The Court will first address the Motion for Leave to File a First Amended Complaint (Doc. 26). Because the Court grants that Motion, the Court will then analyze the Unopposed Motion for Preliminary Approval of Class Action Settlement (Doc. 27), incorporating the Amended Complaint. Ultimately, the Court grants preliminary certification of the class and preliminary approval of the settlement agreement. (Doc. 27).

### A.     Amended Complaint

Here, the parties agreed that the Plaintiffs would seek leave to file this Amended Complaint as part of the settlement process. (Doc. 26, #184). So Mitsubishi does not oppose the motion. (*Id.*). The Amended Complaint substantially repeats the claims alleged in the original Complaint, but it extends those claims to cover the Maysville, Kentucky, facility, too. (*Id.*). It also adds Joseph Horner as a second named plaintiff in order to represent the Kentucky plant. (*Id.*). Because this motion is unopposed and Rule 15 has a "liberal policy of permitting amendments," the Court **GRANTS** Plaintiff's Motion for Leave to File First Amended Complaint (Doc. 26).

Therefore, the Court will treat the Amended Complaint, (Doc. 26-1), as the operative complaint in this Opinion and Order.

## B. Preliminary Approval of Class Action Settlement

To preliminarily approve the class action settlement, the Court must first decide whether to preliminarily certify the class and then decide whether the agreement is a "fair, reasonable, and adequate" disposition of the case. The Court starts with the former inquiry and determines that the five factors for class certification are likely met here. Thus, the Court preliminarily certifies the class for settlement purposes. Then, the Court turns to the substance of the agreement. Finding that the settlement agreement is fair, reasonable, and adequate, the Court preliminarily approves the agreement.

### 1. Preliminary Class Certification for Settlement Purposes

Rule 23 allows a class to be certified only if:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). And on top of the four Rule 23(a) requirements, each of which must be met, a class also must satisfy one of Rule 23(b)'s conditions. The parties here rely on Rule 23(b)(3), (Doc. 27, #220–221), which requires "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

10

### a. Numerosity, Commonality, Typicality, and Adequacy

The Court preliminarily finds that all four Rule 23(a) requirements are met as to the nationwide class. The putative class contains approximately 1,052 individuals in total: 635 from the Mason, Ohio, facility and 417 from Maysville, Kentucky. (Doc. 27, #221). This clearly meets the numerosity requirement. *See, e.g.*, *Hunter v. Booz Allen Hamilton Inc.*, No. 2:19-cv-411, 2023 WL 3204684, at *3 (S.D. Ohio May 2, 2023) (finding that 647 class members meets the numerosity requirement).

Commonality and typicality are also satisfied. To demonstrate questions of law or fact common to the class, Plaintiffs must show that the putative class claims "depend upon a common contention" that is "of such a nature that it is capable of classwide resolution," such that determination of the contention's "truth or falsity" will resolve a central issue to the claims "in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Typicality similarly requires that the named plaintiffs' claims "arise[] from the same event or practice or course of conduct that gives rise to the claims of other class members." *Miller v. Charter Nex Films - Delaware, OH, Inc.*, No. 2:18-cv-1341, 2020 WL 2896913, at *4 (S.D. Ohio June 2, 2020) (quotation omitted).

Plaintiffs and the putative class members here premise their claims on one policy: Mitsubishi's timekeeping and rounding system. (Doc. 26-1, #191–93; Doc. 27, #222). While the exact records showing when an employee clocked in or out vary from employee to employee, the overarching question is whether Mitsubishi utilized a rounding system that effectively did not credit an employee for time if he or she clocked in early or clocked out late. If Mitsubishi had such a policy, then the question

11

is whether that policy violated the FLSA and corresponding state law. This question is common to the class, and answering the question does not require individualized proof; its truth or falsity is capable of resolution "in one stroke." *In re Cinfed Fed. Credit Union Data Breach Litig.*, No. 1:23-cv-776, 2024 WL 6076646, at *4 (S.D. Ohio Sep. 10, 2024) (quoting *Wal-Mart*, 564 U.S. at 350). Furthermore, named plaintiffs Thomas and Horner's claims arise from this rounding policy. (Doc. 27, #208–09, 223). Commonality and typicality are therefore present.

That leaves adequacy, which the Court likewise concludes is satisfied. Class representatives adequately represent the class when they (1) share common interests with the absent class members, and (2) "vigorously prosecute the interests of the class through qualified counsel." *Hunter*, 2023 WL 3204684, at *4 (quotation omitted). The Court finds that Plaintiffs have adequately pursued the interests of the class thus far and that Plaintiffs' interests largely align with the putative class members' interests. Named Plaintiffs Thomas and Horner both allege they were undercompensated due to this rounding policy, like the other putative class members. (Doc. 27, #208–09, 223). Plaintiff Horner, in particular, was added as a named plaintiff because of his efforts to pursue the interests of the Maysville, Kentucky, plant employees. Evidently, he succeeded, given the addition of that facility to the settlement agreement. (Doc. 27, #219–20, 223). Moreover, Plaintiffs secured a sizeable common fund in a timely fashion. (Doc. 27-2, #307 (describing how damages model was created based on pay data for 15% of potential class members for both Ohio and Kentucky

class members), 309 (determining the "overall potential exposure" to Mitsubishi was $605,373.71, so the common fund represents 85% of total lost backpay)).

The Court does note, however, that in providing for potential service awards to class representatives, the agreement creates at least the *potential* for conflicting interests. *See Hawes v. Macy's Inc.* (*Hawes II*), Nos. 1:17-cv-754, 2:20-cv-81, 2024 WL 2125640, at *6 (S.D. Ohio May 13, 2024) (citing *In re Dry Max Pampers Litig.*, 724 F.3d 713, 722 (6th Cir. 2013)). But because the agreement merely raises the *possibility* of such awards, and does not make final approval contingent on the Court granting them, this does not prevent preliminary certification and approval. That said, the Court encourages Plaintiffs to remain mindful of the intended purpose of service awards—compensating class representatives for their efforts on behalf of the class, not providing class representatives a windfall—when making their later request on this front. (Doc. 27, #219–20).

In sum, the Court finds that Rule 23(a)'s requirements are met for provisional certification purposes.

### b.   **Predominance and Superiority**

The Court likewise finds that the class action meets Rule 23(b)(3)'s requirements that (1) the question common to the class predominates, and (2) the class action mechanism is superior to other adjudication methods.

To evaluate predominance, the Court must consider whether "adjudication of questions of liability common to the class will achieve economies of time and expense." *Pickett v. City of Cleveland*, 140 F.4th 300, 310 (6th Cir. 2025) (quotation omitted).

The Court must ask, in other words, "whether a common question is at the heart of the litigation." *Id.* (cleaned up). Here, the common factual question of whether Mitsubishi employed this alleged rounding policy and the common legal question of whether this policy undercompensated employees in violation of the FLSA and related state law form "the heart" of this lawsuit. The only differences among class members are the number of uncompensated minutes. And on that front, the proposed settlement's claim system pays participating class members a pro rata share based on their number of eligible workweeks. (Doc. 27-1, #244). While this does not compensate class members down to the exact minute, it does provide some assurances that the common question of liability will be resolved in a manner that is fair and equitable to each class member, and does so in a way that "achieves economies of time and expense." *Pickett*, 140 F.4th at 310.

As for superiority, the Court considers the difficulties of managing a class action, the alternative adjudication methods to a class action, and the nature of the class claims. *Martin v. Behr Dayton Thermal Prods. LLC*, 896 F.3d 405, 415–16 (6th Cir. 2018) (quotation omitted). A class action better addresses the claims at issue here than individualized actions would, and is thus more efficient than, and superior to, individualized litigation. If each class member were to prosecute his or her own claim, it would likely be cost prohibitive and not worthwhile given that the amount in dispute per head is relatively small. On the flip side, if Mitsubishi were required to defend individual lawsuits, those costs could exceed the benefit made available to employees through the common fund. As a result, a class action is the superior

14

mechanism, in that it allows the employees to recover for the alleged harm, where that may not be possible otherwise.

The Court, in sum, finds that, at this preliminary stage, the common questions of law and fact predominate and that the class action vehicle is the superior method for resolving Plaintiffs' claims. Accordingly, the Court preliminarily certifies the proposed nationwide class as defined in the settlement agreement.

Moreover, the Court provisionally appoints Plaintiffs Jason Thomas and Joseph Horner as class representatives. And upon considering the factors in Rule 23(g)(1), the Court concludes that Plaintiffs' counsel is experienced in handling class actions, knowledgeable on the applicable law, and will ably discharge their duties as class counsel. (*See* Doc. 27-2, #304–06 (documenting counsel's qualifications and history of handling wage-and-hour class actions), 310–11 (describing the work performed by Plaintiffs' counsel so far)). Accordingly, the Court provisionally appoints J. Corey Asay of HKM Employment Attorneys LLP as class counsel. Lastly, the Court provisionally appoints ILYM Group, Inc., as the settlement administrator.

### 2.     Fairness of the Proposed Settlement

The Court now considers Rule 23(e)(1)'s second prerequisite to preliminary class action settlement approval—that the Court would approve the proposed settlement under Rule 23(e)(2) as "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). This turns on whether (1) the class representatives and class counsel have adequately represented the class; (2) the proposed settlement was negotiated at arm's length; (3) the settlement adequately compensates the class; and (4) the settlement

treats class members equitably relative to each other. *See Hawes v. Macy's Inc. (Hawes I)*, 2023 WL 8811499, at \*10 (S.D. Ohio Dec. 20, 2023) (finding that Rule 23(e)(2)'s new factors subsume the factors described in *UAW v. Gen. Motors Corp.*, 497 F.3d 615, 631 (6th Cir. 2007)).

### a.    Adequacy of Representation

The Court finds, for the same reasons described above when preliminarily certifying a class, *see supra* Part B.1, that the class representatives and class counsel have adequately represented the interests of the class.

### b.    Arm's Length Negotiations

The Court is satisfied, based on class counsel's representation and the mutual concessions in the proposed settlement agreement, which were largely determined during mediation, (*see, e.g.*, Doc. 27, #210), that the settlement was negotiated at arm's length and was not plagued by fraud or corruption. *See Todd S. Elwert, Inc., DC v. All. Healthcare Servs., Inc.*, Nos. 5:15-cv-2223, 3:15-cv-2673, 2018 WL 4539287, \*2 (N.D. Ohio Sept. 21, 2018) ("Courts presume the absence of fraud or collusion unless there is evidence to the contrary." (cleaned up)).

### c.    Adequacy of Relief

The Court finds that the settlement agreement adequately compensates the class. Rule 23(e)(2)(C) instructs the Court to consider: (1) "the costs, risks, and delay

16

of trial and appeal"; (2) "the effectiveness of any proposed method of distributing relief to the class"; and (3) "the terms of any proposed award of attorney's fees."[5]

Here, the potential costs and risks of litigation could be significant for both Mitsubishi and Plaintiffs. If this case proceeded to summary judgment or trial, Mitsubishi would face significant discovery costs concerning the timekeeping records and would risk a higher adverse judgment. And if the class cannot prove that Mitsubishi failed to adequately compensate them, they risk recovering nothing.

Against that backdrop, the proposed settlement agreement provides adequate relief. Specifically, class counsel's analysis showed that Mitsubishi's "overall potential exposure" for lost pay and overtime damages was $605,373.71. (Doc. 27-2, #309). The amount of the agreed common fund, $515,000, thus "represents 85% of the Class Members' total lost backpay." (*Id.*). That is an adequate recovery in light of the costs, risks, and delay of trial and appeal.

As for distributing relief, the Court foresees no issues. This case centers on Mitsubishi's timekeeping system, records of which are in Mitsubishi's possession. And because Mitsubishi possesses records for who it employed during the relevant period, the Court anticipates little difficulty in disseminating notice and providing payments to the class. Beyond that, as the Court explains further below, the settlement appropriately compensates class members in a pro rata fashion according to their respective losses. *See infra* Part B.3.

---

[5] The parties identified no agreements (other than the settlement agreement) that are relevant to the Court's consideration, so the fourth adequacy of relief prong is not relevant. *See* Fed. R. Civ. P. 23(e)(2)(C)(iv).

The attorneys' fees award does not weigh against the adequacy of class recovery either.[6] The parties agreed that class counsel will limit any attorneys' fee request to a maximum of one-third of the common fund, or $171,666.67. (Doc. 27-1, #245–46). This proportion is routinely awarded for class action settlements within the Sixth Circuit. *See, e.g.*, *In re Auto. Parts Antitrust Litig.*, No. 12-md-02311, 2022 WL 4385345, at *2–3 (E.D. Mich. Sept. 22, 2022) (approving a one-third fee out of $700,000 common fund); *In re Nat. Century Fin. Enters., Inc. Inv. Litig.*, No. 2:03-md-1565, 2009 WL 1473975, at *3 (S.D. Ohio May 27, 2009) (approving attorneys' fees of 30% of settlement amount, approximately $120,000). More importantly, the Court retains authority to adjust attorneys' fees as part of the final approval process. So, if the requested fees are too high on the facts here, the Court can address that down the road, meaning that attorneys' fees do not counsel against preliminary approval.

### d. Equitable Treatment Among Class Members

The Court finds that the settlement treats the class members equitably. The agreement provides for pro rata payments to all class members who submit valid claims based on their eligible workweeks. Presumably, any underpayments based on rounding accrued over time in a manner roughly proportional to the weeks worked. So the payments are "directly tied to the claims of and harms allegedly suffered by the Class Members." *Carr v. Guardian Healthcare Holdings, Inc.*, No. 2:20-cv-6292,

---

[6] As with the potential service awards, the Court will scrutinize the amount of attorneys' fees actually sought as part of the final approval process.

2022 WL 501206, at *8 (S.D. Ohio Jan. 19, 2022). Thus, the Court is satisfied that the settlement agreement treats class members equitably.

But there's one other thing worth noting here—class representative service awards. While such awards do not *directly* impact the question of equitable treatment (given that the settlement agreement does not stipulate a fixed service award, only a maximum), those awards nonetheless *indirectly* impact the question of equitable treatment. Thomas intends to seek $10,000, and Horner intends to seek $2,500 in service awards. (Doc. 27-1, #245). Whether those amounts impact equitable treatment among class members turns on both (1) the average pro rata payments to Participating Class Members (to see what the proposed service award multiple is), and (2) how much work Thomas or Horner did in pursuing these claims. Both of those are challenging to determine at this time. The settlement agreement does not include an estimated average payout. Nor is the Court certain what effort or expense Thomas or Horner may have incurred. True, this case involved a lengthy mediation, and Thomas incurred out-of-pocket expenses to travel to Nashville, Tennessee, for it. (Doc. 27-2, #311–12). And Horner, as previously mentioned, "was critical to inclusion of the Kentucky Class members." (*Id.*). However, the parties did not provide any specific documentation as to their hours, and the case terminated at a fairly early point in the process. *See In re Cinfed*, 2025 WL 1637686, at *16–17 (finding service awards of $2,000 were excessive, partly because the "case did not involve an answer or a motion to dismiss, and did not proceed to discovery"). That said, and as already noted, the Court can address any such concerns as part of setting the actual class representative

service award (if any) at final approval. And on that note, the class representatives should be prepared to provide justification when they ultimately seek their service awards.

### 3. Proposed Notice Plan

Now turn to the adequacy of the notice plan. "For any class certified under Rule 23(b)(3), the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." *Fidel v. Farley*, 534 F.3d 508, 513 (6th Cir. 2008) (cleaned up). And the notice must also be "reasonably calculated to reach interested parties" to satisfy due process. *Id.* at 514 (quotation omitted). Moreover, Rule 23(c)(2)(B) dictates that the notice describe: "the nature of the action"; "the definition of the class certified"; "the class claims, issues, or defenses"; that any class member may enter an appearance through an attorney or opt out; "the time and manner for requesting exclusion"; and "the binding effect of a class judgment on members under Rule 23(c)(3)."

After examining the proposed notice here, the Court finds that it satisfies due process requirements. The notice clearly provides a description of the class as "current and former hourly employees of [Mitsubishi] who worked at the Mason, Ohio and/or Maysville, Kentucky facility [] at any time between October 24, 2021 and May 11, 2024." (Doc. 27-1, #275). It also discusses how employees claim they were not fully compensated, although it does not specifically describe the rounding policy at issue. (*Id.*). Additionally, it explains the common fund that the settlement creates, including

how settlement class members will be paid based on their eligible workweeks, and directs the reader to visit the settlement website. (*Id.* at #275–77). It further instructs the class member on how to submit a claim form, opt out, or object, as well as the consequences for each choice. (*Id.*). All told, the notice is easy to understand and conforms to *Fidel*'s requirements. And the notice plan, which initially relies on mail notice, as well as email when known, supplemented with a website and telephone number, is reasonably calculated to reach the class members and takes the same approach as many other notice plans. *See, e.g.*, *In re Cinfed*, 2024 WL 6076646, at *7–8; *Carmen v. Health Carousel, LLC*, No. 1:20-cv-313, slip op. at 30–31 (S.D. Ohio June 18, 2024) (located at docket entry 86).

The Court therefore generally approves the notice plan. However, there is an issue related to the cy pres award description, which the Court discusses below. *See infra* Part B.5. Subject to that concern, Mitsubishi will provide the contact information, including names and addresses of class members, to ILYM Group by November 19, 2025 (30 days after preliminary approval). (Doc. 27-1, #253). Before commencing the notice process, ILYM Group shall post this Opinion and Order, the notice, claim form, and proposed settlement agreement on the settlement website. ILYM Group shall then commence providing notice within fourteen days of receiving the contact information (at the latest by December 3, 2025). (*Id.*). Class members shall have sixty days after the mailing date (at the latest by February 1, 2026) to opt out of the class or object to the settlement agreement, in the manner prescribed by the settlement agreement. (*Id.* at #240 (referencing the participation deadline)). All

21

class members who do not timely submit a valid opt-out request will be bound by any final judgment this Court enters in this case and thereby enjoined from bringing or prosecuting any action relating to the claims released under the settlement agreement. (*Id.* at #276).

### 5. Cy Pres Award

That leaves one final issue—the settlement agreement's cy pres provision gives the Court pause. (Doc. 27-1, #260–61). While analysis of the cy pres award does not fall under any of the above sections, the Court nonetheless must evaluate the award when determining whether the proposed settlement agreement is fair. *Hawes I*, 2023 WL 8811499, at *13. To determine whether the proposed cy pres award is procedurally fair under Rule 23, the Court considers both the timing and nature of the award. *Id.* at *15.[7]

The timing of the distribution does not strike the Court as procedurally unfair. That's because the cy pres provision will come into play only for the unused *reserve* funds, not the general common fund, and only if the redistribution of remaining reserve funds is economically infeasible. (Doc. 27-1, #260–61). And it's in those limited circumstances that cy pres awards are considered fair. *Jones v. Monsanto Co.*, 38 F.4th 693, 698–99 (8th Cir. 2022) ("[U]nclaimed funds may only be distributed *cy pres* where existing class-member claimants have been fully compensated and further

---

[7] The Sixth Circuit has not considered whether cy pres awards are fair or equitable under Rule 23. But in looking to other Circuits, particularly the Eighth Circuit in *Jones v. Monsanto Co.*, 38 F.4th 693, 698 (8th Cir. 2022), and *In re BankAmerica Corp. Sec. Litig.*, 775 F.3d 1060, 1064 (8th Cir. 2015), the Court finds helpful limiting principles. *Hawes I*, 2023 WL 8811499, at *13–15 (describing background and state of the law for cy pres awards).

distribution to remaining class members is not feasible."); *see also Hawes I*, 2023 WL 8811499, at *15. So the parties "properly resorted to cy pres as a secondary means of indirect class recovery." *Id.*

But the nature of the award, and more specifically the recipients of the cy pres award, could be more targeted toward the topic at issue in this case: wage-and-hour claims. Cy pres awards are designed as indirect class recovery, and so should be designated "consistent with the nature of the underlying action and with the judicial function." *BankAmerica*, 775 F.3d at 1067 (quotation omitted). In other words, the recipient must "relate directly to the injury alleged in the lawsuit and settled by the parties." *Id.* (cleaned up); *see also Hawes I*, 2023 WL 8811499, at *15 (collecting cases). Here, the parties' suggested recipients are the Legal Aid Society of Greater Cincinnati and Legal Aid of the Bluegrass, with 50% of any unused reserve funds distributed to each. (Doc. 27-1, #260–61). Neither organization handles wage-and-hour disputes, so one could argue that these organizations are unlikely to use the money (should they receive any) in a way that directly relates to the claims here. That said, their work does appear to be designed to protect lower-wage earners generally, a group that may include at least some members of the Settlement Class. In that sense, class members may benefit at least indirectly. More importantly, the small amount at issue—a maximum of $2,500 to each cy pres recipient—counsels in favor of not letting the cy pres award shortcomings upset the settlement apple cart.

On a related note, though, the description of unused reserve funds in the proposed notice is wanting. Currently, the notice states "[t]he value of [the] uncashed

checks may be redistributed to a charitable purpose." (Doc. 27-1, #277). To satisfy due process though, notice must (1) be "reasonably calculated to reach interested parties," and (2) "fairly apprise prospective members of the class of the terms of the proposed settlement so that class members may come to their own conclusions about whether the settlement serves their interests." *Gooch v. Life Invs. Ins. Co. of Am.*, 672 F.3d 402, 422–23 (6th Cir. 2012) (quotations omitted). The generic description in the notice strikes the Court as wrong and/or insufficient in two ways. First, "uncashed checks" would seem to refer to what the settlement agreement calls "unclaimed funds," which escheat to the state. (Doc. 27-1, #260). It is not clear that escheating constitutes "redistribut[ing] to a charitable purpose." (*Id.* at #277). Second, "charitable purpose" lacks the specificity needed to "fairly apprise" the class members of the potential destination for the portion of the proposed settlement, if any, that constitute "unused reserve funds." *Gooch*, 672 F.3d at 423. While the reserve funds are only approximately 1% of the total settlement fund, and any unused portion may be even smaller, this is still a material term of the proposed settlement and should be clearly stated in the notice to putative class members. *Id.*; *see also In re Katrina Canal Breaches Litig.*, 628 F.3d 185, 198 (5th Cir. 2010). To that end, the Court directs the parties to revise the notice to more accurately state the disposition of unclaimed and unused reserve funds, and to submit the revised notice to the Court for review.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** Plaintiff's Motion for Leave to File First Amendment Complaint (Doc. 26). The Court further:

- **PRELIMINARILY CERTIFIES**, for settlement purposes only, the class as defined in the settlement agreement, (Doc. 27-1, #239, 243);

- **PRELIMINARILY APPROVES** the proposed settlement agreement, (*see generally* Doc. 27-1);

- **DIRECTS** the parties to submit within five days a revised notice form consistent with the above;

- **APPROVES** distribution of notice (once revised and approved by the Court) in accordance with the notice plan as described in the settlement agreement, (*id.* at #275–82)),

- **APPROVES** the use of the proposed claim form, (*id.* at #293–94);

- **PROVISIONALLY APPOINTS** Jason Thomas and Joseph Horner as class representatives;

- **PROVISIONALLY APPOINTS** J. Corey Asay, from HKM Employment Attorneys LLP, as counsel for the class;

- **PROVISIONALLY APPOINTS** ILYM Group, Inc. as settlement administrator;

- **ORDERS** that class members shall have 60 days from when ILYM Group, Inc. sends out notice to opt out of the class, to object to the proposed settlement, and to submit settlement claims;

- **ORDERS** that any class members who do not timely opt out of the settlement in the manner provided in the proposed settlement agreement will be bound by the terms of the settlement upon final approval of the same; and

- **SCHEDULES** the final approval hearing for April 8, 2026 at 11:00 a.m. in Courtroom 805.

    **SO ORDERED.**

October 20, 2025
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**