# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

JASON THOMAS, et al.,

      Plaintiffs,

                       Case No. 1:24-cv-422

    v.

                       JUDGE DOUGLAS R. COLE

MITSUBISHI ELECTRIC
AUTOMOTIVE AMERICA, INC.,

      Defendant.

## OPINION AND ORDER

The named Plaintiffs in this class action have filed an unopposed motion in which they seek final court approval of a proposed class action settlement. (Doc. 31). Separately, the named Plaintiffs seek an order awarding attorneys' fees, litigation expenses, and service awards. (Doc. 32). The Court held a hearing on those motions on April 8, 2026. For the reasons discussed below, the Court **GRANTS** Plaintiffs' Unopposed Motion for Final Approval of Class Action Settlement (Doc. 31), and **APPROVES** the class action settlement. The Court further **GRANTS** Plaintiffs' Unopposed Motion for Attorneys' Fees, Litigation Expenses, and Class Representative Service Awards (Doc. 32). Specifically, it **AWARDS** class counsel attorneys' fees in the amount of one-third of the common fund, **$171,666.67**. Beyond that, the Court **AWARDS $9,218.81 in litigation expenses,** and **AWARDS $10,000** to Jason Thomas, and **$2,500** to Joseph Horner, for their service on behalf of the class in prosecuting this action.

## BACKGROUND

### A.    Nature of the Suit and Procedural Background

In its previous Opinion and Order preliminarily approving the settlement agreement, the Court described in detail the time-rounding policy at issue in this case, as well as the procedural history. (*See* Doc. 28, #332). Considering that the factual background of the case has not changed since that Opinion and Order, the Court will only briefly summarize the facts here.

Defendant Mitsubishi Electric Automotive America is a large manufacturer of automobile parts and systems. (Am. Compl., Doc. 26-1, #191).[1] In order to manufacture these parts, Mitsubishi operates many plants, two of which are at issue here: one in Mason, Ohio, and one in Maysville, Kentucky. (*Id.* at #189, 191). At those two plants, Mitsubishi relied on an electronic timekeeping system to record employees' hours and potential overtime. (*Id.* at #191).

Plaintiffs here challenge the timekeeping policies that system utilized. Specifically, they allege that Mitsubishi employed a rounding policy where the system would round the time an employee clocked in or out to the official start or end time of that employee's shift. (*Id.* at #191–93). As an example, "Thomas alleges that one day he arrived at 15:23, but the system marked it as 15:30, the official start of his shift." (Doc. 28, #332 (citing Mot. for Prelim. Approval, Doc. 27, #208)). Thus, Thomas was

---

[1] Plaintiffs initially filed an Amended Complaint (Doc. 25) on April 22, 2025, and then several days later, they filed a Motion for Leave to File First Amended Complaint (Doc. 26). Plaintiffs needed the Court's consent to file an amended complaint at that point in the case, *see* Fed. R. Civ. P. 15(a), and the Court granted leave in the preliminary approval opinion, (Doc. 28, #339–40). Thus, the Court considers the Amended Complaint attached to the motion, (Doc. 26-1), as the operative complaint.

not compensated for those extra seven minutes. Plaintiffs claim that over time, this policy undercompensated them to Mitsubishi's benefit. (Doc. 26-1, #192). Mitsubishi ended this practice in March 2024. (Doc. 27, #209 n.1).

Frustrated that he had been subjected to this system, Thomas sued Mitsubishi five months later on August 9, 2024. (Compl., Doc. 1). He had worked at the Mason, Ohio, plant starting from June 22, 2019, until February 7, 2025, past the filing of this lawsuit. (Doc. 26-1, #189). Later, in the Amended Complaint, Thomas added a second named Plaintiff, Joseph Horner. (*Id.*). Horner had worked in the Maysville, Kentucky, facility from March 5, 2018, until December 15, 2022. (*Id.*).

Plaintiffs do not seek relief for only themselves; they assert both FLSA collective action claims as well as class action claims. (*Id.* at #193–97). Specifically, they bring four claims: "unpaid wages and unpaid overtime under the FLSA (Counts I and II), which are the collective action claims, and the same under Ohio and Kentucky state law (Counts III and IV, respectively), which are the class action claims." (Doc. 28, #333 (citing Doc. 26-1, #197–202)).

On February 7, 2025, the parties engaged in mediation before Michael Russell, "a highly regarded mediator with significant experience in class and collective action wage and hour litigation." (Doc. 31, #378 (citing Asay Decl., Doc. 31-1, #397–98)). After further negotiations, the parties reached a settlement agreement. (*Id.*). The agreement, however, "is not an admission or proof of any wrongdoing or legal violation of any kind." (*Id.* at #380).

3

## B.      Terms of the Proposed Class Action Settlement

On April 25, 2025, Plaintiffs filed an unopposed motion for preliminary approval of their settlement of the class claims, (Doc. 27), attaching the proposed Settlement Agreement, (Doc. 27-1).[2] The Court preliminarily approved the Agreement on October 20, 2025. (Doc. 28). While the Court granted preliminary approval, it expressed concerns about the size of the service awards and lack of detail around the class representatives' contributions to the action. (*Id.* at #349–50).

Given that final approval is now sought, the Court will review the key terms of the Agreement here. First, the parties agree to settle the claims of the Settlement Class in exchange for Defendants paying a total sum of $515,000 into a non-reversionary common fund, which is to be distributed as the Agreement provides. (Doc. 27-1, #239). The Agreement defines the Settlement Class as "all Mason, Ohio Settlement Class Employees and Maysville, Kentucky Settlement Class Employees." (*Id.* at #243). Those groups are further defined as "all non-exempt employees of [Mitsubishi] who worked at its facility in Mason, Ohio at any point from October 24, 2021, to May 11, 2024," and correspondingly, all non-exempt employees who worked at the plant in Maysville, Kentucky, during the same time period. (*Id.* at #239). In the final approval motion, as well as at the final approval hearing, the parties clarified that the Settlement Class also includes ten non-exempt employees who were

---

[2] To be clear, while the Settlement Agreement covered both the class and the collective claims, the request for Court approval was directed only at the class claims. As this Court has opined elsewhere, court approval is not needed for collective action claims under the FLSA, nor do courts have authority to provide it. *Gilstrap v. Sushinati LLC*, 734 F. Supp. 3d 710, 722 (S.D. Ohio 2024).

physically located at a facility in Northville, Michigan, but who "were listed in Defendant's payroll coding for the Mason, Ohio or Maysville, Kentucky facilities because they reported to and supported the work of those facilities, and were subject to the same timekeeping practices." (Doc. 31, #378–79 n.1). Overall, the class totals 1,052 employees: 635 employees from the Ohio facility and 417 employees from the Kentucky facility. (*Id.* at #379).

Importantly, not everyone in the Settlement Class will receive compensation. Rather, the Agreement identifies a subset of employees in the Settlement Class that it refers to as the Participating Class Members. (Doc. 27-1, #240). Employees become part of this subset by returning a claim form in which they agree to also become opt-in members for the FLSA collective action. (*Id.* at #240, 294 (opt-in consent)).

The Agreement contemplates funding and distributing the common fund through the following steps. To start, as stated above, Mitsubishi will contribute $515,000 as the funding for the non-reversionary common fund. (*Id.* at #239, 254). From that amount, the Settlement Administrator, ILYM Group, will first put aside $5,000 as a "reserve fund" for potential distribution to "Participating Class Members who dispute their allocation amounts, to individuals who were not identified as Settlement Class Employees but have a good faith claim for participation in the settlement, or any other reasonable purpose." (*Id.* at #242, 254). With the remaining $510,000, the ILYM Group will next cover the attorneys' fees, litigation expenses, class representative awards, and any administrative expenses. (*Id.* at #245). The Agreement contemplates the class representative awards shall not exceed $10,000 for

5

Jason Thomas and $2,500 for Joseph Horner, but the Agreement leaves to the Court the ultimate determination of the specific amounts. (*Id.*). Next, the parties agreed class counsel's fees will not exceed one-third of the common fund, approximately $171,666.67. (*Id.*). Similarly, litigation expenses shall not exceed $15,000. (*Id.*). (To clarify, though, Plaintiffs have now also separately moved for the maximum service awards and attorneys' fees, but they seek litigation expenses of only $9,218.81. (Doc. 32, #438).) Additionally, ILYM Group requests $12,946.20 for administrative expenses. (Doc. 31, #382 (citing Polites Decl., Doc. 31-2, #415 (ILYM Group representative))).

Once the ILYM Group pays those amounts, the remainder of the fund will be used for distributions to Participating Class Members. (Doc. 27-1, #239, 258). (Again, to be clear, Settlement Class Employees who are *not* Participating Class Members do not receive a distribution.) While not stated in the Agreement itself, the parties contemplate that approximately $303,668.32 will remain for that distribution. (Doc. 31, #382).

As already noted, an employee qualifies as a Participating Class Member if they submitted a claim form within the required timeframe. (Doc. 27-1, #240). The Court previously summarized the distribution method as follows:

> The settlement administrator will disburse available amounts from the common fund on a pro rata basis according to Participating Class Members' eligible work weeks. More specifically, before the participation deadline, the administrator will determine each Settlement Class Employee's estimated allocation, or pro rata share, by "dividing th[at] Settlement Class Employee's Eligible Workweeks by the total combined Eligible Workweeks for all Settlement Class Employees." Then, for employees who opt-out or do not timely submit a claim form,

6

and thus do not become Participating Class Members, their preliminary allocation will be added back to the total fund. Finally, once the participation deadline passes and the Court enters final approval, the administrator will determine each Participating Class Member's final proportionate share of the net settlement amount by "dividing the Participating Class Member's Eligible Workweeks by the total combined Eligible Workweeks of all Participating Class Members." In other words, each Participating Class Member will be assigned a percentage of the funds to be distributed, but Settlement Class Members who are not Participating Class Members (because they opted out or did not return a claim form) will not receive payment.

(Doc. 28, #335–36 (citing Doc. 27-1, #244)).

In the event any of the checks remain uncashed and become void, the ILYM Group will distribute any of the payments meant for Participating Class Members from the Mason, Ohio, facility to the State of Ohio Department of Commerce Unclaimed Funds program, and likewise will distribute any funds meant for Maysville, Kentucky, Participating Class Members to the Commonwealth of Kentucky Treasurer's Unclaimed Property program. (Doc. 27-1, #260). Last, the Agreement also contemplates the possibility of "unused reserve funds," i.e., unused amounts from the $5,000 reserve fund. (*Id.*). The settlement agreement directs the administrator to first attempt to distribute the remainder to Participating Class Members on a pro rata basis, if economically feasible. (*Id.*). If not, then the funds will be equally distributed on a cy pres basis to Legal Aid Society of Greater Cincinnati and Legal Aid of the Bluegrass. (*Id.* at #260–61).

As for how much each Participating Class Member will actually receive, the ILYM Group expects the maximum payment will be $1,466.52, the average payment will be $1,104.25, and the lowest will be $33.08. (Doc. 31, #382 (citing Doc. 31-2, #414)).

On the other side, all members of the Settlement Class release their state-law claims. Specifically, the entire class, except for those who timely opt-out, will release "any and all state and local claims arising from [Settlement Class member's] employment that have been asserted in the Action." (Doc. 27-1, #246–47). Beyond that, those class members who submit a claim form and thus become Participating Class Members have a somewhat broader release. Specifically, the claim form they submit includes a consent to join the FLSA collective action, and as a result, they will also release all of their federal law claims. (*Id.*).

## C. Notice Plan and Results

Under the Settlement Agreement, the ILYM Group was charged with notifying the class members of the settlement. (Doc. 27-1, #254–55). Mitsubishi sent ILYM Group the contact information for the potential class members, which ILYM Group received on November 19, 2025. (Doc. 31-2, #413). On December 3, 2025, ILYM Group mailed the Class Notice packet to the 1,052 class members. (*Id.*). That first round of notice led to 63 returned packets. (*Id.*). From there, it performed a "skip trace" to find updated addresses for those employees, which resulted in 56 updated addresses. (*Id.*). ILYM Group re-mailed packets to those addresses, and after that, only 7 packets were returned. (*Id.* at #413–14). ILYM Group could not locate current addresses for those class members. (*Id.* at #414).

As a result of the notice plan, ILYM Group received 275 valid claims, which represents a valid claim rate of approximately 26%. (*Id.*). It received three timely opt-outs, but it did not receive any objections. (*Id.*).

8

Following final approval, ILYM Group is "responsible for calculation of the settlement award payments, issuance and mailing of the settlement award checks, the necessary tax filing and reporting on such payments, and any other tasks that the Parties agree to and/or the Court orders ILYM Group to perform." (Doc. 31, #382 (citing Doc. 31-2, #415)).

So, as things stand, the Court has reviewed the proposed Settlement Agreement (Doc. 27-1), Plaintiffs' Unopposed Motion for Final Approval of the Class Action Settlement (Doc. 31), and Plaintiffs' Unopposed Motion for Attorneys' Fees, Litigation Expenses, and Class Representative Awards (Doc. 32). Those matters are now ripe for the Court's consideration.

## LAW AND ANALYSIS

### A.  Final Approval of the Settlement Agreement

Before evaluating the fairness of the proposed settlement, the Court must first determine whether to certify the settlement class. *See Amchem Prods, Inc. v. Windsor*, 521 U.S. 591, 620 (1997). For settlement purposes, the parties agreed to a class consisting of "all Mason, Ohio Settlement Class Employees and Maysville, Kentucky Settlement Class Employees." (Doc. 27-1, #243). Those groups are further defined as "all non-exempt employees of [Mitsubishi] who worked at its facility in Mason, Ohio at any point from October 24, 2021 to May 11, 2024," or who likewise worked at the Maysville, Kentucky plant during the same period. (*Id.* at #239). The Court conditionally certified that class when it preliminarily approved the settlement. (Doc. 28, #345).

9

Under *Amchem*, the Court must ensure that the proposed settlement class meets the requirements of Rule 23. 521 U.S. at 620; *see Whitlock v. FSL Mgmt., LLC*, 843 F.3d 1084, 1091 (6th Cir. 2016). Under Rule 23, the Court can certify a class only when:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). On top of Rule 23(a)'s requirements, a class must further satisfy one of Rule 23(b)'s conditions. Here, the parties point to Rule 23(b)(3), which requires "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

In its Opinion and Order preliminarily certifying the class, the Court concluded that the class fulfills each of those requirements. (Doc. 28, #341–45). Nothing has changed since that would disrupt the Court's previous determinations. That said, the Court will briefly address Rule 23(a)'s and Rule 23(b)(3)'s requirements.

### 1. Numerosity, Commonality, Typicality, and Adequacy

The Court finds that each of Rule 23(a)'s four requirements are met as to Plaintiffs' claims. Start with numerosity. A class of 1,052 employees, even divided into the two sub-classes of 635 and 417, easily satisfies that requirement. *See, e.g.*, *Hunter v. Booz Allen Hamilton Inc.*, No. 2:19-cv-411, 2023 WL 3204684, at *3 (S.D.

Ohio May 2, 2023) (647 class members meets numerosity requirement). At the end of the day, 275 class members submitted valid claim forms, so the number of Participating Class Members likewise satisfies this requirement.

Next, consider commonality and typicality. To satisfy commonality, Plaintiffs must show that the class claims "depend upon a common contention … capable of classwide resolution," or in other words, that determining the contention's "truth or falsity" will resolve a central issue to the claims "in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). And to satisfy typicality, the named Plaintiffs' claims must "arise[] from the same event or practice or course of conduct" as the other class members' claims. *Miller v. Charter Nex Films - Delaware, OH, Inc.*, No. 2:18-cv-1341, 2020 WL 2896913, at *4 (S.D. Ohio June 2, 2020). Both are met here. A central issue to Plaintiffs' and the other class members' claims is whether Mitsubishi enforced an unlawful time-keeping policy. And since the answer turns on the legality of the undisputed policy, not any individualized proof, it's resolvable in "one stroke." *Wal-Mart*, 564 U.S. at 350.

Finally, Plaintiffs have "fairly and adequately protect[ed] the interests of the class." Fed. R. Civ. P. 23(a)(4). Class representatives adequately represent the rest of the class when (1) they share common interests with the absent class members, and (2) vigorously "prosecute the interests of the class through qualified counsel." *Hunter*, 2023 WL 3204684, at *4 (cleaned up). Plaintiffs' interests seem to align with the absent class members', and they obtained a settlement with an average estimated payout of $1,104.25. (Doc. 31, #382). On top of that, one named Plaintiff represents

11

each of the facilities at issue, showing that there was representation for each set of employees. That said, the Court renews its reservations about the amount of the requested service awards, which it discusses further below. *See* infra Law & Analysis, Part C.3. Class counsel, moreover, has adequately represented the class, ultimately obtaining a common fund representing 85% of the estimated total loss that the Settlement Class employees incurred. (Doc. 31, #392).

Putting that all together, the Court finds that all the Rule 23(a) factors have been satisfied.

### 2.    Predominance and Superiority

The Court likewise finds that the class action meets Rule 23(b)(3)'s requirements: (1) that the common question to the class predominates, and (2) that a class action is superior to other adjudication methods.

To evaluate predominance, the Court must first determine which issues of fact or law are common to the class and then weigh their predominance against individual questions which vary from class member to class member. *Martin v. Behr Dayton Thermal Prods. LLC*, 896 F.3d 405, 413 (6th Cir. 2018). Factors relevant to that balancing test include: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; [and] (B) the extent and nature of any litigation concerning the controversy already begun by or against class members." Fed. R. Civ. P. 23(b)(3).

The common questions of fact outweigh any questions which may differ among class members. Questions relevant to the whole class include what timekeeping

policies Mitsubishi utilized, whether those operated to the benefit of Mitsubishi and detriment of its employees, and whether those policies violated provisions of the FLSA and related state statutes. The only question that varies between class members is damages because of the individualized nature of timekeeping records. Because the Agreement's distribution formula accounts for differences in the number of work weeks, even if it is not as granular as the number of uncompensated minutes, the Court finds that the individualized damages issue does not determine the predominance question. Further, there is no evidence that any class members had already commenced litigation or that any class members had further interests in controlling their case.

As for superiority, the Court considers the difficulties of managing a class action, the alternative adjudication methods to a class action, and the nature of the class claims. *See Martin*, 896 F.3d at 415–16. Because the costs to litigate (or settle) hundreds of individual claims arising from the time-keeping policy would likely exceed the value of the common fund, let alone the payout to any individual employee, a class action better addresses the claims at issue than individualized lawsuits would. In other words, this class-wide settlement is efficient and superior to individualized litigation.

The Court finds that the common questions of fact predominate and that a class action is superior to other adjudication methods. Accordingly, the Court finally certifies the class proposed in the Settlement Agreement.

### 3.    Notice

The Court also finds that the notice procedure was successful. ILYM Group distributed the notice to the preliminarily certified class members by U.S. mail after receiving the employees' contact information from Mitsubishi. This process constitutes an appropriate notice under Rule 23(c). *See Satterly v. Airstream, Inc.*, Nos. 3:19-cv-32, 3:19-cv-107, 2020 WL 6536342, at *4–5 (S.D. Ohio Sep. 25, 2020) (stating that sending notice by first-class mail to the last known addresses of the putative class members "provided Class Members with an appropriate notice under Rule 23 and met the FLSA's remedial goals"). Indeed, even just mailing the notice once to each class member's address may constitute "'the best notice practicable under the circumstances,' satisfying 'the notice requirements of Rule 23 and the due-process requirement as well.'" *Harsh v. Kalida Mfg., Inc.*, No. 3:18-cv-2239, 2021 WL 4145720, at *4 (N.D. Ohio Sep. 13, 2021) (quoting *Vassalle v. Midland Funding, LLC*, No. 3:11-cv-96, 2014 WL 5162380, at *11 (N.D. Ohio Oct. 14, 2014)). Here, ILYM Group distributed notice to all 1,052 Class Members. (Doc. 31-2, #413). While 63 Class Notice Packets were returned, ILYM Group performed a skip trace to locate updated addresses. (*Id.*). After it re-mailed those packets, only 7 returned again. (*Id.* at #414). That means "[o]ver 99% of the Class Members received notice of this settlement." (Doc. 31, #390). This high delivery rate supports the finding that notice was adequate in this case.

## B.    Fairness of the Proposed Settlement

With class certification settled, the Court now reviews the proposed settlement's fairness. Before the Court can finally approve a proposed settlement, the Court must hold a hearing, which the Court did, and find that the settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). To assess fairness, Rule 23(e)(2), as amended in 2018, directs the Court to consider whether (1) the class representatives and class counsel have adequately represented the class; (2) the proposed settlement was negotiated at arm's length; (3) the settlement adequately compensates the class; and (4) the settlement treats class members equitably relative to each other. Fed. R. Civ. P. 23(e)(2). The Sixth Circuit, though, adopted a longer list of considerations some ten years before that, under which the Court must look to:

> (1) the risk of fraud or collusion; (2) the complexity, expense and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel and class representatives; (6) the reaction of absent class members; and (7) the public interest.

*Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am. v. Gen. Motors Corp.*, 497 F.3d 615, 631 (6th Cir. 2007) (hereinafter *UAW*). The question then is the ongoing relevance of those factors given the amendment to Rule 23(e). In an earlier decision regarding class settlement approval, this Court concluded that the Rule 23(e)(2) factors had largely subsumed the *UAW* factors. *See Hawes v. Macy's Inc.*, No. 1:17-cv-754, 2023 WL 8811499, at *10 (S.D. Ohio Dec. 20, 2023). But a more recent Sixth Circuit decision at least suggests that the reality may be a tad more complicated. Specifically, that court suggested that:

15

> To assess the reasonableness of a settlement, we consider the factors identified in Rule 23(e)(2), *as well as* (1) the likelihood of success on the merits of the case, (2) the complexity, expense, and duration of discovery and litigation, (3) the opinions of class members, representatives, and counsel, and (4) the risk of collusion or fraud."

*In re East Palestine Train Derailment*, 158 F.4th 704, 713 (6th Cir. 2025) (citing *UAW*, 497 F.3d at 631) (emphasis added).

While the Court still is of the view that the four factors set forth in the as-amended version of Rule 23(e)(2) already include consideration of the four additional factors identified above, out of an abundance of caution, the Court will address all eight. But spoiler alert—the Court ultimately finds, based on the information Plaintiffs provided in their briefing and at the hearing, that the Settlement Agreement is "fair, reasonable, and adequate."

### 1.    Adequacy of Representation

For the same reasons explained above when finally certifying the class, *see* supra Law & Analysis, Part A, the Court finds that the class representatives and class counsel have adequately represented the class. The class representatives advocated for both plants, and Thomas specifically attended the mediation that led to the present settlement agreement. (Doc. 31, #391). As for counsel, they have extensive wage-and-hour class action experience, and successfully secured a settlement representing approximately 85% of the estimated losses. (Doc. 31-1, #398).

### 2.    Arm's Length Negotiations

Based on both class counsel's and defense counsel's representations at the fairness hearing, and the mutual concessions reflected in the Settlement Agreement,

16

the Court is satisfied that the settlement was negotiated at arm's length. *See Todd S. Elwert, Inc. DC v. All. Healthcare Servs., Inc.*, Nos. 5:15-cv-2223, 3:15-cv-2673, 2018 WL 4539287, at *2 (S.D. Ohio Sep. 21, 2018) ("Courts presume the absence of fraud or collusion unless there is evidence to the contrary." (cleaned up)). Moreover, much of the settlement was decided through a lengthy mediation in front of class-action mediator, Michael Russell, further supporting the notion that it was an arm's length agreement. (Doc. 31, #391).

### 3.    Adequacy of Relief

Rule 23(e)(2)(C) asks whether "the relief provided for the class is adequate." To assess the adequacy of the relief, the Court considers: (1) "the costs, risks and delay of trial and appeal"; (2) "the effectiveness of any proposed method of distributing relief to the class"; and (3) "the terms of any proposed award of attorney's fees." *Id.*[3]

The adequacy of the settlement's proposed relief far outweighs the potential costs and risks of continued litigation. Mitsubishi would likely have had to expend significant resources responding to discovery requests regarding all work records, and it risks an adverse judgment if it proceeds to trial. At least at first glance, it looks like the rounding policy may have worked to its favor. On the other hand, if the class failed to prove that Mitsubishi utilized an unlawful timekeeping policy, or if the Court found the worker time involved to be de minimis, the class risks recovering nothing.

---

[3] The parties have identified no agreements (other than the Settlement Agreement) that are relevant to the Court's consideration, so the fourth adequacy-of-relief prong is inapplicable. *See* Fed. R. Civ. P. 23(e)(2)(C)(iv).

The settlement thus provides an efficient mechanism to resolve this dispute with overall cost, time, and risk avoidance for all parties.

As for distributing relief to the class, the Court does not foresee any issues. This class action centers on underpayment of employees due to an unlawful rounding policy. So providing payments to class members should prove relatively straightforward—Mitsubishi had all of their employment paperwork and likely contact information. To the extent Mitsubishi lacked current addresses, ILYM Group successfully tracked down updated ones. Additionally, the settlement's distribution formula is based on the number of weeks worked, so those who were likely underpaid the most will receive the largest payouts, at least if they filed a claim form to become a Participating Class Member. Such an allocation suggests fairness. *See Hawes I*, 2023 WL 8811499, at *12.

That leaves the proposed attorneys' fees award, which likewise does not weigh against the adequacy of the class recovery under the Settlement Agreement. That's because the Settlement Agreement itself doesn't require payment of attorneys' fees; it simply says that class counsel will seek them. (The Court separately addresses the amount of such fees it is authorizing below. *See* infra Law & Analysis, Part C.1.)

### 4. Equitable Treatment Among Class Members

The Settlement Agreement also treats class members, at least Participating Class Members, equitably. The Settlement Administrator will distribute the common fund on a pro rata basis based on each Participating Class Member's number of eligible work weeks. (Doc. 27-1, #244). While that may differ slightly from that

employee's proportion of uncompensated minutes, the Court finds it is an efficient and equitable distribution formula.

That said, the Court does have a couple of concerns. First, as noted, the distributions go only to Participating Class Members, which represent about 26% of the total Settlement Class Employees. (Doc. 27-1, #254; Doc. 31-2, #414). Given that the parties represent that the non-reversionary common fund purportedly represents roughly 85% of the total alleged harm that the Settlement Class Employees as a whole incurred, (Doc. 31, #392), that means that Participating Class Members are receiving payments that likely exceed their own harm (as a common fund representing 85% of total damages is being distributed to 26% of the employees who incurred that harm). Yet, all of the Settlement Class Employees, even those who did not file claims forms to become Participating Class Members and thus will receive no distribution, are still releasing their state-law claims. (Doc. 27-1, #276). Ultimately, though, the Court concludes that this does not, in and of itself, prevent a finding that the distribution mechanism is equitable. Courts often approve class settlements in which only those class members who send in a claim form receive a distribution. *Cullen v. RYVL Inc.*, No. 3:23-cv-185, 2025 WL 2836651, at *4 (S.D. Cal. Aug. 20, 2025) (granting preliminary approval where all class members release claims, whether or not they submitted a claim form to receive compensation); *Herrell v. L & B Transp., LLC*, No. 3:24-cv-965, 2025 WL 2425745, at *2 (M.D. La. Aug. 21, 2025) (granting final approval); *see also Dick v. Sprint Commc'n Co. L.P.*, 297 F.R.D. 283, 291–92 (W.D. Ky. 2014) (approving settlement to convey easement to defendant, even

where class members did not file a claim form to receive compensation but did not opt out); *Manual for Complex Litigation*, § 21.66 (4th ed. 2025) ("Class members must usually file claims forms providing details about their claims and other information needed to administer the settlement."). Short of a bright-line rule that such arrangements are never permissible, which the Court declines to adopt, there seems nothing particularly egregious about the proportions at issue here (i.e., a 26% claim rate). Moreover, as to any employee who is a Settlement Class Member but *not* a Participating Class Member, that employee will not release his federal claims, meaning they could still seek recovery under the FLSA if they are so inclined. In sum, the Court finds that the distribution mechanism here fits within the broad umbrella of an equitable distribution.

Separately, though, the Court also has expressed concerns about the size of the service awards that the class representatives seek. But that likewise does not preclude a finding that the Settlement Agreement is equitable. That is because the Agreement doesn't require a fixed service award—it merely states that the awards are "not to exceed" $10,000 for Jason Thomas and $2,500 for Joseph Horner. (Doc. 27-1, #245). The Settlement Agreement's inclusion of the mere *potential* for service awards does not categorically render that agreement inequitable under Rule 23. (*Id.*). That said, while the size of the requested service awards does not impact approval, the Court has more to say about the actual *amount* of the appropriate service awards below. *See* infra Law & Analysis, Part C.3.

In sum, the Court finds that the Settlement Agreement meets Rule 23(e)'s requirements. That leaves the four other factors from *UAW* that the Sixth Circuit identified as potentially separate: (1) the likelihood of success on the merits of the case, (2) the complexity, expense, and duration of discovery and litigation, (3) the opinions of class members, representatives, and counsel, and (4) the risk of collusion or fraud. *See In re East Palestine Derailment*, 158 F.4th at 713.

### 5.      Likelihood of Success on the Merits.

As already noted in discussing the adequacy of the relief, it is difficult to predict with accuracy who would have prevailed at trial. The class seems to have a strong argument that the time system, which Mitsubishi has since discontinued, may have systematically worked to Mitsubishi's benefit. And the claims at issue do not have an intent requirement, so it matters little whether Mitsubishi was aware of, or intended, that effect. On the other hand, the time at issue on a per employee basis may have been so small as to be de minimis, or perhaps Mitsubishi could have showed that the rounding sometimes worked to the employees' benefit.

At bottom, it seems to the Court that the class had a substantial likelihood of success on the merits, but not a slam dunk by any means. So a common fund that represents 85% of the total time at issue strikes the Court as reasonable.

### 6.      Complexity, Expense, and Duration of Litigation

The issues here were perhaps not that complex, but the litigation certainly threatened to be expensive and long-lived. Mitsubishi had produced substantial time records for its employees. Working through those records, and then attempting to

21

assess how much rounding occurred as to each employee, threatened to be a time-consuming (and thus expensive) endeavor. Without the settlement, Mitsubishi would have spent the money otherwise in the common fund on counsel to defend the action. Instead, that money now compensates its employees. And it brings what otherwise would be time-consuming litigation to an early resolution. All of that counts in favor of the settlement.

### 7.     Opinions of Class Members, Representatives, and Counsel

The named representatives and class counsel have both indicated that they strongly approve of the settlement. From what the Court can glean from the record, that is true of the absent class members, as well. As noted above, 99% of the class received notice of the class settlement. (Doc. 31, #390). Only three class members opted out, and no class member objected. (Doc. 31-2, #414). So this factor supports approval.

### 8.     Risk of collusion or fraud

The same reasons the Court noted above that strongly suggest this settlement was the result of an arm's length negotiation also suggest that there was no risk of fraud or collusion. *See* supra Law & Analysis, Part B.2. This factor supports approval, as well.

As all eight factors support the settlement, the Court concludes that it is fair, reasonable, and adequate. With that, the Court turns to the other pending motion, which involves attorneys' fees, expenses, and service awards.

22

**C.     Attorneys' Fees, Expenses, and Service Awards**

**1.     Attorneys' Fees**

The Court starts with Class Counsel's request for fees. But before undertaking the analysis, the Court starts by briefly addressing why Plaintiffs must make such a request. The Court has covered the issue in some detail before. *See In re Cinfed Fed. Credit Union Data Breach Litig.*, No. 1:23-cv-776, 2025 WL 1637686, at *10 (S.D. Ohio June 10, 2025). So in the interest of brevity, the Court incorporates that discussion by reference and merely reiterates the key points here.

Typically, attorneys' fees are a matter between attorneys and their clients, subject to loose control only through ethics rules and bar complaints. But, in class actions, absent class members generally do not play any role in selecting class counsel, nor do they "agree" to the fees those counsel charge. Rather, at most, they get notice and an opportunity to be heard on that topic in connection with settlement. So courts must be on the lookout for potential conflicts of interest between class counsel and absent class members. *See Evans v. TIN, Inc.*, No. 11-2067, 2013 WL 4501061, at *11 (E.D. La. Aug. 21, 2013) ("The Court is well aware of its obligation to protect the interests of the class in its role as a fiduciary and to ensure the reasonableness of attorney's fees.").

At the same time, the Court must also remain mindful that counsel are entitled to be "fairly compensated for the amount of work done as well as for the results achieved." *Rawlings v. Prudential-Bache Props., Inc.*, 9 F.3d 513, 516 (6th Cir. 1993) (citation omitted). After all, without class counsel, the class would not have recovered from Mitsubishi at all.

Against that backdrop, Federal Rule of Civil Procedure 23(h) specifically authorizes a court to "award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." From there, "[d]istrict courts apply a two-part analysis to assess the reasonableness of an attorney fee petition." *Harsh v. Kalida Mfg., Inc.*, No. 3:18-cv-2239, 2021 WL 4145720, at *8 (N.D. Ohio Sep. 13, 2021) (citation omitted). The first step is to "determine the appropriate method to calculate the fees, using either the percentage of fund or the Lodestar approach." *Id.* After that, the Court turns to the six *Ramey* factors, so-named for *Ramey v. Cincinnati Enquirer, Inc.*, 508 F.2d 1188 (6th Cir. 1974). Those factors include:

> (1) the value of the benefit rendered to the [plaintiff] class; (2) society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others; (3) whether the services were undertaken on a contingent fee basis; (4) the value of the services on an hourly basis; (5) the complexity of the litigation; and (6) the professional skill and standing of counsel involved on both sides.

*Swigart v. Fifth Third Bank*, No. 1:11-cv-88, 2014 WL 3447947, at *6 (S.D. Ohio July 11, 2014) (modification omitted) (quoting *Ramey*, 508 F.2d at 1196).

So how do those factors apply here? Class Counsel request attorneys' fees of $171,666.67, representing one-third of the common fund. (Doc. 32, #438). The Court finds that request reasonable. To start, district courts routinely award attorneys' fees of 20% to 50% of the common fund. *Brotherton v. Cleveland*, 141 F. Supp. 2d 907, 910 (S.D. Ohio 2001); *Connectivity Sys. Inc. v. Nat'l City Bank*, No. 2:08-cv-1119, 2011 WL 292008, at *12 (S.D. Ohio Jan. 26, 2011) (collecting cases). So an award of one-third of the common fund falls well within the normal range.

24

Beyond that, the *Ramey* factors also show that the requested fee is reasonable. First, Class Counsel have achieved considerable beneficial results for the class, including securing a settlement representing approximately 85% of the total unpaid wages allegedly owed. (Doc. 32, #442). Additionally, Participating Class Members will receive an average payout of $1,104.25, which is not insignificant, particularly in a class action. (Doc. 31, #382). And they will receive it now (or shortly after final approval), unlike if the case had continued. Beyond that, as already mentioned, "[s]ociety has a stake in awarding attorneys who achieve a result that the individual class members probably could not obtain on their own." *Myers v. Mem'l Health Sys. Marietta Mem'l Hosp.*, No. 15-cv-2956, 2022 WL 4079559, at *6 (S.D. Ohio Sep. 6, 2022) (quotation omitted). It also is worth noting that Class Counsel worked on a contingency basis, meaning they undertook the expenses so far without promise of compensation.

As for the fourth factor, the value of the services on an hourly basis, the Court performs a lodestar cross-check. This check prevents counsel from "receiving a windfall" and "ensure[s] that the fee award is still roughly aligned with the amount of work the attorneys contributed." *In re Cardinal Health Inc. Sec. Litig.*, 528 F. Supp. 2d 752, 764 (S.D. Ohio 2007). In doing so, however, the Court does not "exhaustively scrutinize[]" counsel's hours and documentation, unlike a full lodestar analysis. *Id.* at 767 (quotation omitted).

Here, Class Counsel alleges they have spent approximately 190.6 hours on this matter. (Doc. 31-1, #401). Based on their normal rates, they estimate the current

combined lodestar is $104,007.50. (*Id.*). Compared to the one-third of the fund at the time of distribution, Class Counsel estimates that the lodestar multiplier is 1.65. (*Id.*). This is within the range of lodestar multipliers that courts in this Circuit have found acceptable. *Lowther v. AK Steel Corp.*, No. 1:11-cv-877, 2012 WL 6676131, at *5 (S.D. Ohio Dec. 21, 2012) (finding lodestar multiplier of 3.06 "very acceptable" and collecting cases approving multiples up to 8.74); *Smith v. Fifth Third Bank*, No. 2021 WL 11713313, at *7 (S.D. Ohio Aug. 31, 2021) (citing *In re Cardinal Health Inc. Sec. Litig.*, 528 F. Supp. 2d at 767–78) (approving of lodestar multipliers between 1.3 and 4.5). So this likewise supports a finding that the fee request here is reasonable and not a windfall.

As for the final two factors, "[w]age and hour litigation is inherently complex and time-consuming." *Smith v. Local Cantina, LLC*, No. 2:20-cv-3064, 2022 WL 1183325, at *4 (S.D. Ohio Apr. 19, 2022) (citation omitted). Beyond that, this case involves two different plants across two states, adding to the complexity. And the Court finds that counsel's professional skill on both sides of this dispute also supports the requested fee.

Putting that all together, the Court finds the requested attorneys' fees are reasonable. The Court thus awards $171,666.67, representing one-third of the common fund.

### 2.    Litigation Expenses

Additionally, "under the common fund doctrine, class counsel is entitled to reimbursement of all reasonable out-of-pocket litigation expenses and costs in the

26

prosecution of claims, and in obtaining settlement, including but not limited to expenses incurred in connection with document products, consulting with and deposing experts, travel and other litigation-related expenses." *Karpik v. Huntington Bancshares Inc.*, No. 2:17-cv-1153, 2021 WL 757123, at *9 (S.D. Ohio Feb. 18, 2021) (cleaned up) (quoting *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 535 (E.D. Mich. 2003)). Here, Class Counsel requests $9,218.81 for costs and expenses. (Doc. 32, #447; (citing Doc. 31-1, #404)). Having reviewed Asay's declaration and the attached expense chart, the Court finds these costs and expenses are reasonable. Thus, the Court awards Class Counsel $9,218.81 in expenses, to be paid from the common fund.

### 3.    Class Representatives' Service Awards

Last, Plaintiffs move for service awards of $10,000 for Jason Thomas and $2,500 for Joseph Horner. Awards are generally appropriate for "class representatives who have had extensive involvement in a class action litigation [and] deserve compensation above and beyond amounts to which they are entitled to by virtue of class membership alone." *Lonardo v. Travelers Indem. Co.*, 706 F. Supp. 2d 766, 787 (N.D. Ohio 2010) (citation omitted). That said, service awards should not be windfalls either. *Hawes v. Macy's Inc.*, No. 1:17-cv-754, 2024 WL 2125640, at *6 (S.D. Ohio May 13, 2024).

Here, Class Counsel provided a description of Thomas's and Horner's contributions as well as affidavits from both named Plaintiffs. (Doc. 32, #448–49; Thomas Decl., Doc. 32-2; Horner Decl., Doc. 32-3). Specifically, they estimate that

27

Thomas spent roughly 35–40 hours on this matter in general as well as traveled from Cincinnati, Ohio, to Nashville, Tennessee, for the mediation. (Doc. 32, #449). Additionally, Horner was crucial to the inclusion of the Maysville, Kentucky, plant. (*Id.* at #449–50). While he spent less time on the case, without his participation, it is likely the Kentucky plant would not have recovered at all.

Considering that the average payout is around $1,000, the Court finds that awards of $10,000 for Thomas and $2,500 for Horner would not represent a windfall for the class representatives as compared to the other class members, and instead adequately compensates them for their efforts on behalf of the class.

### CONCLUSION

For the reasons discussed above, the Court **GRANTS** Plaintiffs' Unopposed Motion for Final Approval of Class Action Settlement (Doc. 31), and **ACCEPTS** the proposed settlement agreement. Finally, the Court **GRANTS** Plaintiffs' Unopposed Motion for Attorneys' Fees, Expenses, and Class Representative Service Awards (Doc. 32). Specifically, the Court **AWARDS** class counsel attorneys' fees of $171,666.67 and $9,218.81 in costs and expenses, and **AWARDS** $10,000 to Jason Thomas and $2,500 to Joseph Horner as service awards. Finally, the Court **DIRECTS** the Clerk to enter judgment and to **TERMINATE** this case on its docket.

**SO ORDERED.**

May 26, 2026
 **DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**

28